[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**February 14, 2006**
**THOMAS K. KAHN**
**CLERK**

No. 05-14198
Non-Argument Calendar

_____

D. C. Docket No. 04-60931-CV-WPD

CAROLE F. SLATTERY,

Plaintiff-Appellant,

versus

PRECISION RESPONSE CORPORATION,
a Florida corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 14, 2006)**

Before ANDERSON, BIRCH and CARNES, Circuit Judges.

PER CURIAM:

Carole Slattery appeals the district court's grant of summary judgment in

favor of Precision Response Corporation on her claim under the Equal Pay Act, 29 U.S.C. § 206(d). We affirm.

**I.**

Precision is a Florida corporation that manages outsourced customer contact centers. Companies hire Precision to communicate with their customers via telephone, email, and the Internet. The contact centers are located in Florida and some foreign countries.

In November of 1993, Precision hired Slattery, a female, as an account manager at an annual salary of $37,000. She was assigned to the British Airways account and initially oversaw thirteen employees, including one supervisor and twelve telephone service representatives ("TSRs"). The number of employees she supervised eventually rose to eighteen. Although the average monthly revenues generated on the account were "small," Slattery received regular pay increases. Her salary was raised to $38,500 in 1995, to $43,000 in 1996, and to $48,315 in 1998.

In April of 1999, Precision promoted Slattery to senior account manager. Shortly thereafter, British Airways outsourced its United States Reservations Program to Precision, and the work was assigned to Slattery. The program was initially scheduled to run only six weeks. Slattery oversaw a total of 12

supervisors and between 325 and 360 TSRs in three different facilities. Average annual revenues from the British Airways account rose to between $2,400,000 and $3,600,000. In September of 1999, Slattery's salary increased to $55,494.

In July of 2000, Slattery was promoted to account director, and her annual salary rose to $68,000. In her new position, she supervised two program managers. She claims that her duties expanded to include financial responsibilities and direct responsibility for growth of the British Airways account.

In mid-2001, the United States Reservations Program was phased out. As a result, the British Airways account become less demanding and profitable. Slattery's job responsibilities decreased to overseeing fewer than fifty employees and managing programs that generated $2,004,000 in annual revenue. Nonetheless, Slattery's salary continued to rise. It increased to $69,373.73 in 2001, and to $71,397.74 in 2002.

In mid-2002, Precision underwent a reorganization, and Slattery was one of four account directors who were removed from their positions. Her title changed to program manager. In mid-2003, British Airways eliminated two programs that Precision was handling. From June of 2003 to March of 2004, the British Airways account generated about $1,368,000 in annual revenues. In June of 2003,

Slattery's salary was increased to $73,539.67.

As a program manager, Slattery began reporting to Account Director Harold Dukenik. Because she was now supervising only twenty-five employees on the British Airways account, Precision assigned Slattery the Reader's Digest account, which had twenty employees. In November of 2003, Dukenik presented Slattery with a written overview of various problems with her performance and asked her to prepare a plan to address them. In January of 2004, Dukenik informed Slattery that she was not meeting requirements and fired her.

On June 18, 2004, Slattery filed a complaint against Precision in state court, alleging violations of the Equal Pay Act, 29 U.S.C. § 206(d). She did not claim that she was fired because of her gender, only that she did not receive equal pay before being fired. Precision removed the action to federal court. On April 22, 2005, Precision filed a motion for summary judgment. Slattery subsequently filed a motion for adverse inferences based upon Precision's alleged failure to produce certain documents during discovery.

On June 29, 2005, the district court entered an order denying Slattery's motion for adverse inferences and granting Precision's motion for summary judgment. The court found that Slattery had not established a prima facie case because she had not raised a genuine issue of material fact that her jobs were

4

substantially similar to those of her male comparators. The court also found that Precision had set forth a valid affirmative defense because it had demonstrated that factors other than sex were responsible for the disparity in pay between Slattery and her comparators.

## II.

On appeal, Slattery contends that the district court erred in denying her motion for adverse inferences based on Precision's alleged bad faith in failing to produce six types of documents. We review for abuse of discretion a district court's denial of a party's motion for adverse inferences. Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 811 (8th Cir. 2005).

This Court draws an adverse inference from a party's failure to preserve evidence "only when the absence of that evidence is predicated on bad faith," such as where the party tampers with the evidence. Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997). "Mere negligence in losing or destroying the records is not enough for an adverse inference." Id. (internal marks omitted).

Assuming arguendo that Slattery's requests for production included the six types of documents she claims were withheld and that Precision did in fact withhold them, she is not entitled to the adverse inferences she requested. Slattery has shown no evidence that Precision withheld or tampered with any of the

5

documents in bad faith. Accordingly, the district court did not abuse its discretion in declining to grant her motion for adverse inferences.

**III.**

Slattery also contends that the district court erred in granting Precision's motion for summary judgment on the ground that she had failed to demonstrate a prima facie case under the Equal Pay Act. Slattery argues that she raised a genuine issue of material fact that the jobs of her and her comparators required equal skill, effort, and responsibility, and were therefore "substantially equal."

We review de novo a district court's decision to grant summary judgment. Maynard v. Bd. of Regents, 342 F.3d 1281, 1288 (11th Cir. 2003). "A party seeking summary judgment must demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000) (citation and internal marks omitted). "In determining whether genuine issues of material fact exist, we resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party." Id.

A plaintiff demonstrates a prima facie case of a violation of the Equal Pay Act if an employer pays different wages to employees of different sexes for equal work on jobs requiring equal skill, effort, and responsibility. Irby v. Bittick, 44

F.3d 949, 954 (11th Cir. 1995). "A plaintiff establishes a prima facie case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992) (internal marks omitted). If the plaintiff does not perform significant duties that the other employees engage in, their jobs are not substantially equal. See Waters v. Turner, Wood & Smith Ins. Agency, Inc., 874 F.2d 797, 799–800 (11th Cir. 1989).

After a plaintiff establishes a prima facie case, an employer must prove by a preponderance of the evidence that the differential is justified by one of four exceptions set forth in the Act. Corning Glass Works v. Brennan, 417 U.S. 188, 196, 94 S. Ct. 2223, 2229 (1974). The exceptions are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality; and (4) a differential based on any factor other than sex. Id.; Price v. Lockheed Space Operations Co., 856 F.2d 1503, 1505 (11th Cir. 1988). A defendant must show that gender provided no basis for the wage differential. Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590 (11th Cir. 1995). If the defendant fails to meet this burden, the court must enter judgment for the plaintiff. Irby, 44 F.3d at 954. "When the defendant overcomes the burden, the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event

justification for a gender-based differential." Id. (citation omitted). "If the plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial." Id.

Because Slattery contends that two male colleagues, Dukenik and Scott Ryan, earned more than her even though their jobs were substantially equal, we must consider their work histories.[1] We begin with Ryan. In October of 1996, Precision hired Ryan as an account manager at an annual salary of $67,000. He was assigned to the Pizza Hut account and initially supervised about forty-four employees, including an operations manager, an account manager, two supervisors, and approximately forty TSRs. The Pizza Hut account generated annual revenues of approximately $1,200,000.

In October of 1997, Precision promoted Ryan to senior account services manager, increased his salary to $71,020, and assigned him to additional accounts. He handled the Pitney Bowes account during five months a year for two consecutive years, overseeing 150 TSRs. He also handled the Shared

---

[1] Slattery also compares her salary to that of Alberto Pardo, a male. We have stated that an Equal Pay Act claimant may only recover for the discriminatory pay received within the statute of limitations period. Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1180 n.15 (11th Cir. 2005). A claim based on a willful violation of the Act must be filed within three years of the accrual of the cause of action. See 29 U.S.C. § 255. Before July 9, 2000, Pardo earned more than Slattery, however from that date forward, Slattery earned more than Pardo. Because Slattery filed this lawsuit in June of 2004, nearly four years after Pardo's salary last exceeded Slattery's salary, her comparison to Pardo is time-barred.

Environment account, overseeing a supervisor and about fifteen TSRs. During this time, Ryan also had invoicing, forecasting, and budgeting responsibilities for the entire division, including the British Airways account.

Precision later promoted Ryan to director and assigned him the Mellon account. He supervised 50 employees year-round, and an additional 300 employees for four to five large projects each year. He continued to perform the invoicing, forecasting, and budgeting work for the entire division. From 2001 to June of 2002, Ryan handled the Mellon account with fifty employees; the Pizza Hut account with sixty employees; the Shared Environment account with forty employees; and the College Board account with forty-five employees. In other words, during that period he supervised a total of 195 employees on four different accounts. Precision promoted him to senior director and increased his salary to $89,179.81 in 2001, and to $94,536.17 in 2002.

After May of 2002, Ryan's responsibilities changed. He stopped working on the Pizza Hut, Shared Environment, and College Board accounts but continued to handle the Mellon account. He was also assigned to the eBay and Priceline.com accounts, which together had fifty-five to sixty-five employees. He left Precision in July of 2003.

Slattery has not created a genuine issue of material fact that her job was

substantially equal to Ryan's job. For the first several years of her employment, Slattery oversaw no more than eighteen employees. When Ryan was hired, he oversaw forty-four employees. When the United States Reservations Program was operating, Slattery supervised more employees than Ryan, but during that period Ryan performed important duties that Slattery did not. He handled the invoicing, forecasting, and budgeting responsibilities of an entire division, which included Slattery's British Airways account. Also, for all but the first year of his employment, Ryan was assigned to three or more accounts. Slattery, by contrast, was assigned to only one account for all but the last year-and-a-half of her employment, during which she was assigned to only two accounts. Supervising more employees, performing additional, significant duties, and managing more accounts requires greater skill, effort, and responsibility. See Irby, 44 F.3d at 954; Waters, 874 F.2d at 799–800.

Next, we must consider whether Slattery's job was substantially equal to Dukenik's job. In January of 1997, Precision hired Dukenik as an account manager at an annual salary of $78,000. He was assigned to the Phillip Morris account and initially supervised between thirty and forty employees. In January of 1998, Precision promoted Dukenik to senior account manager and his salary was increased to $84,000. In April of 2000, Precision promoted Dukenik to account

10

director and raised his salary to $94,371.59. He was assigned an additional account, Census. He supervised between 300 and 500 employees on the Phillip Morris account and 600 employees on the Census account. The Phillip Morris account generated annual revenue in excess of $31 million.

Slattery does not raise a genuine issue of material fact that her job was substantially equal to Dukenik's job. When Dukenik was hired, he oversaw between thirty to forty employees, about double the number that Slattery initially supervised. During the first year of the United States Reservations Program, Slattery supervised about the same number of employees as Dukenik, however the Phillip Morris account was generating significantly greater annual revenues (more than $31 million for Phillip Morris compared to no more than $3,600,000 for British Airways). After April of 2000, Dukenik supervised between 900 and 1100 employees. Slattery, by contrast, oversaw between 300 and 400 employees until mid-2001, and no more than 50 thereafter. Supervising more employees and handling accounts with greater revenues requires greater skill, effort, and responsibility. See Irby, 44 F.3d at 954.

Because Slattery has failed to raise a genuine issue of material fact that her job required the same skill, effort, and responsibility as the jobs of her comparators, the district court did not err in granting Precision's motion for

11

summary judgment for her failure to establish a prima facie case under the Equal Pay Act.[2]

AFFIRMED.

---

[2] Because the district court properly granted Precision's motion for summary judgment on the ground of the prima facie case, we do not need to consider Slattery's final argument as to whether Precision demonstrated a valid affirmative defense.